UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ST. JAMES APARTMENTS, LLC, et al., | |
| Plaintiffs, | Civil Action No. 10-6778 (MAS) (DEA)<br>Civil Action No. 11-0549 (MAS) (DEA)<br>(consolidated action) |
| v. | **OPINION AND FINAL JUDGMENT** |
| COINMACH CORPORATION, | |
| Defendant. | |

**SHIPP, District Judge**

This matter comes before the Court over disputed lease agreements between St. James Apartments, LLC ("St. James"), Jasontown Apartments, LLC ("Jasontown") and Hackensack Associates LP ("Hackensack") (collectively, "Plaintiffs" or "Properties") and Coinmach Corporation ("Defendant" or "Coinmach"). A two-day bench trial commenced on April 2, 2013 and concluded on April 3, 2013. The Court has considered the evidence and testimony adduced at trial, the Parties' legal positions, and the applicable law. The Court now enters final judgment on the merits of all pending claims. The Court finds that the disputed leases were executed without the requisite authority and are accordingly invalid, ineffective, and/or not in force.

I. **BACKGROUND**

A. **Jurisdiction**

This case comes before the Court based on diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1). The parties are citizens of different states. Plaintiffs' sole member or partner, James Nuckel ("Mr. Nuckel" or "Nuckel"), is a resident of Florida. (Compl. ¶¶ 2-4, ECF No. 1.)

Defendant Coinmach is a citizen of both Delaware and New Jersey for purposes of federal diversity jurisdiction. (Ans. ¶ 5, ECF No. 16.) In addition, the amount in controversy exceeds the sum of $75,000. (Compl. ¶ 6.)

### B. Procedural History

This action is brought by Plaintiffs seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 that certain disputed lease agreements are not legally binding and/or are otherwise unenforceable. (Compl. ¶ 1.) On February 1, 2011, Defendant moved to dismiss Plaintiffs' Complaint. (ECF No. 8.) On July 13, 2011, the Court denied Defendant's motion to dismiss. (ECF Nos. 13, 14.) On July 16, 2012, Defendant moved for summary judgment. (ECF No. 27.) The Court held oral argument and denied the motion for summary judgment on October 25, 2012. (ECF Nos. 36. and 37.) On April 2, 2013, a bench trial commenced during which four witnesses testified. Following the trial, on May 10, 2013, the Parties each submitted Amended Proposed Findings of Fact and Conclusions of Law. (Pls.' Amend. Proposed Findings, ECF No. 51.; Def.'s Amend. Proposed Findings, ECF No. 52.)

### C. Findings of Fact

Mr. Nuckel serves as the sole member or partner of the Properties. (Trial Testimony of James Nuckel, Vol. I at 20:12-22:10.) In 2002, the Properties contracted with Coinmach to lease space in each of the Properties for Coinmach to operate laundry machines. (Nuckel Vol. I 35:1-8.) The 2002 contracts were signed by Joseph Andolino, who then served as the director of operations for the Properties. (Nuckel Vol. I 35:9-25.) When they expired in 2010, Coinmach sought to renew the agreements. (Dela Vega Vol. I 81:5-23.) Based on Coinmach's supposed weak profits on the Properties, Daniel Collins, Coinmach's sales representative, decided to reduce the amount that Coinmach would pay to Plaintiffs. (Collins Vol. I 155:15-156:8.) In

addition, the new leases were automatically renewable. (Collins Vol. I 17:10-23:21.) As a result, Coinmach's lease proposals were based on new terms that were more beneficial to Coinmach. (*Id.*)

Mr. Collins contacted Plaintiffs' residential property manager, Nina Dela Vega, to discuss renewing the leases. (Collins Vol. I 155:16-23.) Coinmach identified and listed Ms. Dela Vega as the Properties' contact person in Coinmach's internal system. (Collins Vol. I 155:21-23.)

Ms. Dela Vega asked Mr. Collins to send her copies of the proposed lease agreements by e-mail, which he did. (Collins Vol. I 162:14-163:8.) Ms. Dela Vega then printed the proposed lease agreements and left them in a folder for Mr. Nuckel to review. (Dela Vega Vol. I 84:6-15.) Mr. Nuckel, however, did not see the documents and Plaintiffs initially took no action vis-à-vis the lease renewals. (Nuckel Vol. I 40:3-6; Dela Vega Vol. I 85:9-12.)

Once the 2002 leases for Jasontown, St. James and Hackensack expired in July, August and September of 2010, respectively, Coinmach continued to operate and collect revenue from the laundry machines, but stopped making monthly payments to the Properties. (Dela Vega Vol. I 140:14-18; Dela Vega Vol. I 86:20-87:4.) In November, Ms. Dela Vega was advised that Coinmach had stopped making its monthly payments. (Dela Vega Vol. I 86:20-24.) She contacted Tony Perez, Coinmach's operations manager, who informed her that Plaintiffs would have to renew the leases in order to receive Coinmach's past due payments. (Dela Vega Vol. I 89:3-23.) Ms. Dela Vega, unable to contract on her own, spoke with Tony Perechino, a consultant working for Mr. Nuckel, who instructed her to sign the lease. (Dela Vega Vol. I 92:1-93:2.) Ms. Dela Vega understood that Mr. Perechino had discussed the contract with Mr. Nuckel, but in fact he had not. (*Id.*) Ms. Dela Vega subsequently signed the disputed agreements on

3

November 23, 2010. (Dela Vega Vol. I 93:3-21.) Mr. Collins testified that he received the leases via e-mail on Thanksgiving Day and processed them by printing, signing, and sending them back to the main office on the same day. (Collins Vol. I 164:24-25).

On November 29, 2010, Mr. Nuckel learned for the first time that Ms. Dela Vega had signed the lease renewals. (Nuckel Vol. I 38:19-22.) He demanded that she inform Coinmach that her execution of the disputed leases was an error and that she did not have authority to sign them. (Nuckel Vol. I 39:13-23.) Ms. Dela Vega complied, calling Mr. Perez and sending written notices to Coinmach on that same day, November 29, 2010. (Dela Vega Vol. I 94:12-96:4; 97:11-98:19; Ex. P-3.) On the same day, Ms. Dela Vega received a voicemail from Jessica Desmond-Judkins, the administrator at Coinmach responsible for processing agreements. (Dela Vega Vol. I 96:5-8.) Ms. Desmond-Judkins indicated that no new agreement had been processed as of that day. (Ex. P-4.) Nevertheless, Coinmach refused to nullify the agreements and insisted on having them enforced. (Collins Vol. II 41:1-4.) Instead, on December 1, 2010, Coinmach ordered new laundry machines for the Properties. (Collins Vol. II 32:23-37:14.) Further, Coinmach has continued to operate its laundry machines at the Properties and to collect money from them. (Dela Vega Vol. I 140:14-18.)

## I. LEGAL DISCUSSION

The Court will analyze whether Ms. Dela Vega had either actual or apparent authority to sign the agreement and bind Plaintiffs. Plaintiffs allege that the lease agreements are invalid because Ms. Dela Vega did not have authority to execute the contracts on their behalf. (Compl. ¶¶ 31-35.) An agent must be authorized by its principal in order for the principal to be bound. *See Rodriguez v. Hudson Cnty. Collision Co.*, 296 N.J. Super. 213, 220 (App. Div. 1997) ("An agency relationship arises when one party authorizes another to act on its behalf while retaining

4

the right to control and direct any such acts.") (internal quotations and citations omitted). "The power of an agent to bind his principal is limited to such acts as are within his actual or apparent authority." *Carlson v. Hannah*, 6 N.J. 202, 212 (1951) (internal citation omitted). As an initial matter, the Court must examine whether or not Ms. Dela Vega was capable of binding Plaintiffs, specifically, whether she had either actual or apparent authority.

### A. Ms. Dela Vega had no Actual Authority to Execute the Disputed Leases

#### 1. Standard

"Actual authority is the authority that a principal expressly or implicitly gives an agent." *Automated Salvage Transp., Inc. v. NV Koninklijke KNP BT*, 106 F. Supp. 2d 606, 617 (D.N.J. 1999) (internal citation omitted). Actual authority can be either express or implied. *Id.* Express authority stems from the principal's instructions to the agent to perform a specific task. *Id.* at 618. ("For example, if a principal instructs his agent to buy a certain piece of property, the agent possesses express authority – the power to dispense cash for the property.") "Express authority is manifested through the principal's words or other conduct." *Id.* at 617. Additionally, express authority can only be given to the agent by the principal; a third party lacking authority does not have the ability to authorize the agent. *See Avon Sheet Metal Co. v. Heritage House Assoc.*, 107 N.J. Super. 487, 493 (Dist. Ct. Essex Cty. 1969).

Implied authority exists where an agent performs a task within the scope of his implied duties. The principal's authority is presumed to have been granted in accordance with the agent's job responsibilities. *See Carlson*, 6 N.J. at 212 (Implied authority stems "from the nature or extent of the function to be performed, the general course of conducting the business, or from particular circumstances of the case.")

5

Specifically, implied authority exists when an agent carries out an action that is necessary to fulfill his expressly authorized obligations. *See Automated Salvage Transp.*, 106 F. Supp. at 617 ("For the most part, an agent has implied authority to undertake all transactions necessary to fulfill the duties required of an agent in exercise of express authority." (citing *Thomas v. I.N.S.*, 35 F.3d 1332, 1338 (9th Cir.1994)). For instance, if a principal empowers an agent "to 'sell my car', the only fully expressed power is to transfer title in exchange for money." Restatement (Second) of Agency § 7 cmt. c. However, other powers necessary to carry out such a transaction, such as the power to convey, give possession of, or extend credit to, may be "implied or inferred from the words used, from customs and from the relations of the parties." *Id.* "Implied authority is incidental to a grant of express authority. As mentioned, implied authority consists of those powers incidental and necessary to carry out a grant of express authority." *Sylvan Learning Sys., Inc. v. Gordon*, 135 F. Supp. 2d 529, 544 (D.N.J. 2000) (internal citations omitted).

### 2. Analysis

Coinmach argues that Ms. Dela Vega had actual authority to sign the disputed leases. According to Coinmach, Ms. Dela Vega was authorized to consult with Mr. Perechino in the event that Mr. Nuckel could not be reached. (Def.'s Amend. Proposed Findings, Concl. of Law ¶ 8.) In addition, Coinmach argues that Mr. Nuckel gave Mr. Perechino the authority to approve the contract. (*Id.*) Therefore, according to Defendant, when Ms. Dela Vega asked and was told by Mr. Perechino to sign the contract, she had express authorization to do so. (*Id.* at ¶ 9.). The Court does not agree. The Court may have found express authority if the evidence demonstrated that Mr. Nuckel instructed Ms. Dela Vega to execute the disputed leases. However, the record and trial testimony reflect no indication of any such direction by Mr. Nuckel to Ms. Dela Vega. Rather, the uncontroverted evidence reflects that Mr. Nuckel was unaware that Ms. Dela Vega

executed the leases until after the disputed agreements were signed and sent to the Defendant. (Nuckel Vol. I 38:7-24.)

Mr. Perechino lacked the requisite authority to execute the disputed leases. In absence of such authority, he was unable to delegate authority to Ms. Dela Vega. As discussed, authority must flow exclusively from the principal. The Court finds to be credible Mr. Nuckel's testimony stating that Mr. Perechino's role at the Properties was exceedingly limited. (Nuckel Vol. I 30:3-32:21.) According to Mr. Nuckel, Mr. Perechino was hired as a consultant to review the Properties' activities and was not authorized to approve any contracts. (*Id.*) Accordingly, the Court finds that Mr. Perechino, as an unauthorized third party, could not have conferred express authority upon Ms. Dela Vega.

Furthermore, the Court finds that Ms. Dela Vega had no implied authority to sign the contract. Coinmach has failed to demonstrate that Ms. Dela Vega was acting within the scope of her duties. The record reflects that Ms. Dela Vega's duties were simply those of a residential property manager of an apartment complex. (Dela Vega Vol. I 77:19-79:16.) Her primary obligation was to rent apartments to tenants. (Dela Vega Vol. I 79:10-16.) There is no evidence that Ms. Dela Vega ever executed any contracts on behalf of the Properties, other than those in dispute. Nor is there evidence that executing the disputed leases was within the scope of carrying out her express job responsibilities. Further, the Court finds that neither the particular circumstances of this case, nor the nature of Ms. Dela Vega's responsibilities, support a finding of implied actual authority. Ms. Dela Vega operated "with no policy-making authority, could not act contrary to the policy of the [Properties], and thus did not have the actual authority to agree to [the terms of the disputed leases.]" *Farmers & Merchs. Nat. Bank v. San Clemente Fin. Grp. Sec., Inc.*, 174 F.R.D. 572, 578-79 (D.N.J. 1997).

For the reasons set forth above, the Court finds that Ms. Dela Vega had no actual authority to sign the agreements.

### B. Ms. Dela Vega had no Apparent Authority to Execute the Disputed Leases

#### 1. Standard

When an agent acts with apparent authority, he can bind the principal to an agreement. *Carlson*, 6 N.J. at 212. Apparent authority exists when: 1) there is an appearance of an agent's authority based on the principal's conduct; 2) the third party relied on that apparent authority; and 3) the third party's reliance was reasonable. *Mercer v. Weyerhaeuser Co.*, 324 N.J. Super. 290, 318 (1999). The court must determine whether the principal acted in a manner that conveyed to the third party that the agent was acting with the principal's approval. *Id.* It is the actions of the principal, not the agent, that determine whether or not authority was present. *Greene v. BMW of N. Am.*, No. 11-04220 (WJM), 2012 WL 5986461, at *5 (D.N.J. Nov. 28, 2012). In addition, the third party must have relied on the agent's apparent authority in a manner related to the principal's actions and not that of the agent. *Mercer*, 324 N.J. Super. at 318. Lastly, the third party's reliance on the agent's apparent authority must be within reason. *Id.* The party seeking imposition of authority has the burden of proof to establish that these factors are satisfied. *Id.*

#### 2. Analysis

The Court finds that Coinmach failed to demonstrate that Ms. Dela Vega had apparent authority to sign the leases. Coinmach, as the party seeking to prove the existence of authority, must demonstrate that, based on the Properties' actions, Ms. Dela Vega had the requisite authorization to execute the contracts. The Properties, with Mr. Nuckel serving as the sole member or partner, are the principals. Coinmach argues that Mr. Nuckel and Coinmach having

8

had no prior contact, is indicative of the existence of apparent authority. (Def.'s Amend. Proposed Findings, Concl. of Law ¶¶ 17, 25.) However, the Court finds the absence of contact between the two Parties supports Plaintiffs' position that the Properties took no action affording apparent authority.

Coinmach makes much of its 2002 lease agreements with Plaintiffs, which were not signed by Mr. Nuckel. Those contracts were signed by Mr. Andolino, who served as the Director of Operations for the Properties in 2002. With regard to the disputed lease agreements, however, Mr. Andolino was not the signatory. Rather, Ms. Dela Vega affixed her signature. Mr. Andolino's signature on the 2002 agreements does not undermine Plaintiffs' position that Ms. Dela Vega did not have apparent authority. As an initial matter, Ms. Dela Vega does not hold the same or even a similar title to Mr. Andolino. Further, any apparent authority that may have been vested in Mr. Andolino does not extend to Ms. Dela Vega.

The Court credits Mr. Nuckel's testimony that he was unaware of the 2002 contracts with Coinmach until a year after the documents were executed. This execution, once more, represents actions taken by an agent that do not reflect the authority of the principal. In addition, there is a sharp contrast between Mr. Andolino and Ms. Dela Vega. Specifically, although the 2002 contracts were executed without authorization, Mr. Nuckel's testimony indicates that, on other occasions, Mr. Andolino was involved in negotiating agreements with the consultation of Mr. Nuckel. It was a component of his job responsibilities as the Director of Operations. However, with respect to Ms. Dela Vega, as property manager, the record indicates that she had not executed a single contract prior to those in dispute. Thus, the Court finds the evidence of the principals' actions in the instant matter insufficient to vest Ms. Dela Vega with apparent authority.

Additionally, Coinmach's alleged reliance is unfounded. "[T]he essential element of reliance must be present before apparent authority can be found." *Simpkins v. 7-Eleven, Inc.*, A-3702-06T3, 2008 WL 918482 (N.J. Super. Ct. App. Div. Apr. 7, 2008) (internal citation omitted). Coinmach argues that it relied on the Properties' portrayal of Ms. Dela Vega as authorized to sign the disputed leases. In this regard, the 2002 lease agreements do not support the existence of reliance because the clear, uncontroverted testimony from Coinmach's representatives is that when the disputed lease agreements were negotiated, Coinmach's agent was not aware of who signed the 2002 lease agreements. (Collins Vol. I 164:24-25.) Accordingly, the fact that an unauthorized agent signed the 2002 lease agreements was not a factor insofar as Coinmach's reliance interests are concerned.

In addition, Coinmach alleges that the disputed leases were processed upon receipt on Thanksgiving Day. Mr. Collins testified that he received the signed leases via e-mail on Thanksgiving Day and proceeded to print, sign and process them on that same day. (Collins Vol. I 169:12-171:11.) However, Coinmach has failed to produce any records to support this testimony. Rather, the evidence supports that Coinmach had not processed the leases until after it was informed by Ms. Dela Vega that her execution of the disputed leases was not authorized. Ms. Dela Vega received a voicemail on November 29, 2010 from Ms. Desmond-Judkins, the Coinmach agent responsible for processing new contracts, indicating that no new lease had been executed as of that day. (Ex. P-4.) Furthermore, Coinmach contends that it relied on Ms. Dela Vega's apparent authority when it processed an order for new laundry machines. However, Mr. Collins admitted that this work order was processed on December 1, 2010, two days after Ms. Dela Vega informed Coinmach of her lack of authority. (Collins Vol. II 36:23-37:14.)

10

Furthermore, to the extent Coinmach argues that its reliance flows from Ms. Dela Vega's actions, this is insufficient. "[A]pparent authority by which a principal is bound is only that which a person of ordinary prudence is justified in presuming from the conduct of the principal. Such authority is not expanded by the carelessness and indifference of the third party *nor erected upon the misrepresentations of the agent.*" *Farmers & Merchs. Nat. Bank v. San Clemente Fin. Grp. Sec., Inc.*, 174 F.R.D. 572, 579 (D.N.J. 1997) (internal citation and quotations omitted) (emphasis added).

The Court finds that the record and trial testimony do not support the existence of apparent authority. Specifically, there is insufficient conduct from the principal to support that Ms. Dela Vega was vested with apparent authority. Furthermore, the record does not support that Coinmach reasonably relied on any manifestations of authority flowing from the principal.[1]

## III. CONCLUSION

For the reasons set forth above, the Court concludes that Ms. Dela Vega did not have the requisite authority to execute the disputed lease agreements. Therefore, the disputed lease agreements are not enforceable. The Court will enter an Order consistent with this Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[1] The Court does not reach the Properties' alternative theories addressing the invalidity of the disputed lease agreements. Specifically, since the Court holds that Ms. Dela Vega did not have the requisite authority, it is unnecessary to explore whether her amended statement constituted a counteroffer, and/or whether the installation of new machines was equivalent to a necessary condition of the disputed lease.

11